## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

OZOMA ERICA ANAZA, ROGER ASHTON,
MARCELLO BALDERRAMA, JENNIFER BARRY,
MICHAEL COCCO, APRIL EXLINE,
KEN GREENFIELD, MELISSA GREENFIELD,
CHRIST HIOTIS, LEROY HUNTE,
JODELL JOHNSON, JUNETTA LANE,
ANIBAL LUGO, JO ALEJANDRA LUGO,
JOHN MURRAY, THOMAS NESTOR,
BERNADETTE NESTOR, CARLOS NICHOLSON,
FRANK NOVELLO, BETSY OPYT,
LINA PEREZ, RAYNA ROBINSON,
ANTHONY SERRO, BARBARA SERRO,
DAVID SHAPIRO, TAMEKI STONE,
MARCUS THOMAS, ROSETTA THOMAS,
HERB WRESCHNER, LEONA WRESCHNER,
individually, and on behalf of all other
members of the Florida and National
Classes,

      Plaintiffs,

v.                                  Civil Action No.:

AUDI AG, a German Corporation,
and AUDI OF AMERICA, LLC. a Virginia
Corporation,

      Defendants.
_____/

## COMPLAINT

## FLORIDA AND NATIONAL CLASS ACTION

I.      Plaintiffs, individually and on behalf of all other members of the Florida and

National Classes, similarly situated, hereinafter collectively referred to as (the "Class", "Classes, or Class Members"), bring this Class Action Complaint (the "Complaint") against Defendants Audi AG and Audi of America, LLC (the "Defendants" or "Audi"). Where applicable, allegations are based on personal knowledge, information and belief, as well as upon investigation.

## A.   NATURE AND SYNOPSIS OF THE ACTION

1.      This action, founded upon false advertising and consumer fraud, is predicated upon events perpetrated against federal and state regulators and the citizens of the State of Florida, the United States and others by Audi, one of the world's largest, best known and (and until the occurrence of these events) most respected luxury vehicle manufacturers in the world.

2.      The scheme to defraud was cleverly crafted around the intentional installation of emission defeat devices (the "Defeat Devices") on over 200,000 gasoline operated, Audi branded vehicles, including, but not necessarily limited to the Audi A6, A8, Q5, Q7, S4, S5, S6, and S7 models, (the "Affected Vehicles") sold in the United States, including, in the State of Florida, from 2008 through 2016 and perhaps longer, (the "Relevant Period").

3.      The Defeat Devices were employed by Audi to create the illusion that its vehicles were energy efficient and environmentally sensitive without sacrificing performance.

4.    Audi misrepresented the true nature of its Affected Vehicles to consumers and regulators by advertising and otherwise falsely representing that the Affected Vehicles offered superlative performance in combination with clean, legally compliant emissions.

5.    Audi sold Affected Vehicles to Plaintiffs and other Florida and National Class Members without informing them of the existence of the Defeat Device, and by falsely representing to them the fuel efficiency of the vehicles and also falsely representing to them that the vehicles were compliant with all relevant emissions standards when operated in normal use.

6.    Plaintiffs and the Florida and National Class Members suffered damages as a result of Audi's misrepresentations and omissions regarding the Defeat Devices, including, but not limited to, overpayment for their vehicles (which are incapable of providing the balance of performance, fuel efficiency, and cleanliness that Audi advertised) together with the associated diminution of vehicle value once the presence of the Defeat Devices was made known to the public. Additionally, Plaintiffs and Class Members suffered all damages recoverable pursuant to the various causes of actions sued on.

## B.    JURISDICTION AND VENUE

7.      This Court has Federal Question jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the Florida state law claims pursuant to 28 U.S.C. § 1367.

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (d) because at least one Class member is of diverse citizenship from Audi; there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000 exclusive of costs and interest.

9.      This Court has personal jurisdiction over Audi in that its contacts with the state of Florida are systematic, continuous, and sufficient to subject it to the personal jurisdiction of this Court.  Specifically, Audi purposefully availed itself of the privilege of conducting business in Florida by advertising and selling its manufactured vehicles (including the Affected Vehicles) within the state of Florida. Additionally, Audi has maintained systematic and continuous business contacts within Florida (including contact with its authorized dealers within the state) and is registered to conduct business in the state of Florida. Additionally, these Defendants have conspired to commit and have in fact committed the fraudulent acts and omissions complained of herein throughout the United States, including, within this District and have directed their illegal acts against Plaintiffs as well as other Florida Class Members.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because:

a.  Defendants have dealerships in this District;

b.  Defendants sell a substantial number of automobiles in this District, and;

c.  Defendants' acts complained of herein occurred, in many instances, within or had impact within this District.

## C.    PARTIES

**Plaintiffs:**

11.    All named Plaintiffs are residents of the State of Florida and have purchased one of the Affected Vehicles during the Relevant Period. Upon information and belief, some Plaintiffs are known to be elderly, disabled or are otherwise entitled to special damages under one or more causes of action brought herein.  The named Plaintiffs herein and the respective vehicles that they purchased are as follows:

| | | |
|---|---|---|
| a. Ozoma Erica Anaza | 2014 | Audi  A6 |
| b.  Roger Ashton | 2014 | Audi  Q5 |
| c.  Roger Ashton | 2015 | Audi  Q5 |
| d.  Marcello Balderrama | 2016 | Audi  A5 |
| e.  Jennifer Barry | 2014 | Audi  Q5 |
| f.  Michael Cocco | 2016 | Audi  A6 |
| g.  April Exline | 2015 | Audi  Q5 |
| h.  Ken and Melissa Greenfield | 2014 | Audi  Q5 |
| i.  Christ Hiotis | 2015 | Audi  S5 |

| | | | |
|---|---|---|---|
| j. Leroy Hunte | 2014 | Audi | Q5 |
| k. Jodell Johnson | 2015 | Audi | Q5 |
| l. Junetta Lane | 2014 | Audi | Q5 |
| m. Anibal and Jo Alejandra Lugo | 2015 | Audi | Q7 |
| n. Anibal and Jo Alejandra Lugo | 2015 | Audi | Q7 |
| o. John Murray | 2015 | Audi | A8 |
| p. Thomas and Bernadette Nestor | 2014 | Audi | Q5 |
| q. Carlos Nicholson | 2014 | Audi | Q5 |
| r. Frank Novello | 2014 | Audi | A6 |
| s. Betsy Opyt | 2015 | Audi | Q5 |
| t. Lina Perez | 2015 | Audi | Q7 |
| u. Rayna Robinson | 2014 | Audi | Q5 |
| v. Anthony and Barbara Serro | 2015 | Audi | Q7 |
| w. David Shapiro | 2014 | Audi | Q5 |
| x. Tameki Stone | 2015 | Audi | Q7 |
| y. Marcus and Rosetta Thomas | 2015 | Audi | Q7 |
| z. Herb and Leona Wreschner | 2014 | Audi | A8L |

**Defendants:**

12.     Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany. Accordingly, defendant, Audi AG, is a citizen of Germany.

13.     Audi AG is the parent company of Audi of America, LLC and a subsidiary of the Audi Group, which is a wholly owned subsidiary of Volkswagen

AG ("Volkswagen").  Audi AG directly controls the actions of Audi of America, LLC.

14.     Audi AG designs, develops, manufactures, and sells luxury automobiles.  According to Audi AG, the Audi Group sold more than 200,000 vehicles in the United States in 2015.

15.     Defendant Audi of America, LLC is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia.  Accordingly, defendant Audi of America, LLC is a citizen of Delaware and Virginia. Audi of America, LLC is a wholly owned United States subsidiary of Audi AG, and it engages in business, including, the advertising, marketing, and sale of Audi automobiles, in all fifty states and the District of Columbia.

16.     Throughout the Relevant Period, Audi manufactured, distributed, sold, leased, and warranted the Audi brand name (the Affected Vehicles) throughout the United States, and the District of Columbia, including, the State of Florida. Audi and/or its agents designed, manufactured, and installed the engines and engine control systems, including, the Defeat Device, in the Affected Vehicles. Audi also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional material related to the Affected Vehicles throughout the United States and District of Columbia, including, the State of Florida.

**D.**  **STATUTES OF LIMITATION TOLLED**

17.  **By the Discovery Rule:**

a.  The tolling doctrine was designed specifically for cases such as this, where pertinent facts were concealed from Plaintiffs. Consequently, for the following reasons, any statutes of limitation that might have otherwise applied have been tolled by the discovery rule with respect to all claims.

b.  Even through the exercise of reasonable diligence, Plaintiffs could not have discovered, within any applicable statute of limitations, that Audi was concealing and misrepresenting the true emissions levels of the Affected Vehicles and that Audi was using Defeat Devices to subvert State and Federal emissions' testing.

c.  It was not until the German newspaper Bild am Sonntag reported on CARB's discovery of the Defeat Device on November 5, 2016, that the public at large first became aware of  the Defeat Device.

d.  Plaintiffs did not know and could not have known until November 7, 2016, when published reports disclosed that the vehicles were equipped with the Defeat Device. Therefore, Plaintiff's' claims and the claims of all Class Members did not accrue until they discovered (either actually or constructively) that the Defeat Device caused the vehicles to fail required emissions standards.

e.  Plaintiffs could not have reasonably discovered, nor could they have

otherwise known of facts that would lead a reasonable person to believe or even suspect, that Audi intentionally failed to report information within its knowledge to federal and state regulatory authorities, its dealerships, and its consumers.

f.  Moreover, a reasonable and diligent investigation could not have disclosed that Audi had information in its sole possession about the existence of its sophisticated scheme of emissions deception, and that it had concealed that information, valuing its profits over both legal compliance and consumer protection.

18.    **By Fraudulent Concealment:**

a.  Throughout the Relevant Period, all applicable statutes of limitation have been tolled by Audi's knowledge  and active fraudulent concealment and denial of the facts alleged in this Complaint.  Audi kept Plaintiffs and the other Class Members from attaining vital information essential to the pursuit of their claims. As a result, neither Plaintiffs nor the other Class Members could have discovered the defect, even upon reasonable exercise of diligence.

b.  Instead of disclosing its fraudulent emissions scheme, or disclosing that the emissions from the Affected Vehicles were far worse than had been represented, Audi falsely represented to consumers and regulators that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer who could be trusted.

c.  Prior to the date of this Complaint, Audi knew of the Defeat Device

in the Affected Vehicles but continued to manufacture, market, distribute, lease, and/or sell the Affected Vehicles to Plaintiffs and other Class Members.  In doing so, Audi concealed from or failed to notify Plaintiffs and other Class Members about the true design and qualities of the Affected Vehicles.

d.  Plaintiffs and the other Class Members justifiably relied on Audi to disclose these material defects in the Audi vehicles they purchased or leased, in that such defects were hidden and not discoverable through reasonable efforts by Plaintiffs and the other Class Members.

e.  Thus, the running of all applicable statutes of limitation have been tolled and suspended by virtue of  fraudulent concealment with respect to any claims that inure to the Plaintiffs and the other Class Members.

19.   **By  Estoppel:**

a.  Audi was under a continuous duty to disclose to Plaintiffs and the other Class Members the facts that it knew about the emissions from the Affected Vehicles, as well as information regarding the Affected Vehicles' failure to comply with federal and state emission laws.

b. Audi was under a continuous duty to disclose to Plaintiffs and the other Class Members the existence of the Defeat Device, which substantially affected the true character, quality, performance, and nature of the vehicles. Audi actively concealed the true character, quality, performance, and nature of the Defeat Device

in the Affected Vehicles, and Plaintiffs and the other Class Members reasonably relied upon Audi's actively concealed knowledge.  Audi is accordingly estopped from relying on any statutes of limitation in defense of this action. For these same reasons, Audi is estopped from relying upon any warranty, mileage, and age limitations in defense of this action.

c.  Although Audi had a duty, throughout the Relevant Period, to disclose to Plaintiffs and other Class Members that it had engaged in the deception described in this Complaint, Defendants chose to evade federal and state emissions and clean air standards with respect to the Affected Vehicles. Furthermore, Audi intentionally misrepresented its blatant and deceptive lack of compliance with federal and Florida state laws regulating vehicle emissions and clean air.

d.  Consequently, Audi is estopped from relying upon any statutes of limitation in defense of this action. For these same reasons, Audi is estopped from relying upon any warranty, mileage, and age limitations in defense of this action.

**E.     FACTUAL ALLEGATIONS:**

20.  Over approximately the past seven years, Audi has been illegally and unjustly enriched by illicit profits or revenues from fraud perpetrated against its Florida and Nationwide consumers.

21.   Audi marketed the Affected Vehicles as environmentally friendly combining extremely high fuel efficiency and performance with extraordinarily low

toxic emissions.  Audi touted the vehicles as containing a unique combustion system that enabled them to meet and substantially exceed national emission standards on a cost-effective basis.

22.   The United States government and virtually every state, including, the State of Florida have enacted legislation and promulgated rules and regulations designed to protect United States citizens from pollution and, in particular, certain chemicals and agents known to cause disease in humans.  Automobile manufacturers are held to absolute compliance with these regulatory measures.

23.   Audi  purposefully and intentionally breached these measures by manufacturing and then selling in the United States, including, the state of Florida, vehicles that employed the Defeat Devices.

24.   Instead of fulfilling its promised commitment to deliver exceptionally high fuel mileage coupled with low emissions, Audi devised a method to make it appear that its Affected Vehicles complied with emission regulations enacted by all fifty states, the District of Columbia and the State of Florida when, in fact, they did not. Sophisticated software in the Affected Vehicles detects when the vehicle is undergoing regulatory emissions testing, and turns full emissions controls on for the purposes of defeating the accuracy of the tests. In normal road use, however, the emissions controls are suppressed. This results in vehicles that meet and conform to emissions standards in a test environment but, when road driven, emit $CO_2$ in

12

amounts which exceed the standards allowed under State and federal laws and regulations. This software, as produced and used by Audi, is a "Defeat Device" as defined by the Clean Air Act, 42 U.S.C. §7401 et seq. (1970), and applies to each state, the District of Columbia and the State of Florida.

25.    On or about July 2016, the California Air Resources Board ("CARB") discovered that Audi had illegally installed a Defeat Device on several Audi models equipped with a certain eight-speed automatic transmission to deceptively manipulate the emission of the noxious gas $CO_2$.

26.    From 2008 through May 2016, Audi installed the Defeat Device on both gasoline and diesel engine vehicles that were equipped with either of two automatic transmissions bearing the internal designations AL 551 and DL 501. The AL 551 is a member of the ZF 8HP family of eight-speed units which Audi sourced from transmission supplier ZF Friedrichshafen, commonly known as ZF. The DL 501 model Audi was sourced from Volkswagen. The vehicles that Audi equipped with the AL 551 and DL 501 transmissions (containing the Defeat Device) include, but may not be limited to, the Audi A6, A8, Q5, Q7, S4, S5, S6, and S7 models.

27.    The Defeat Device uses engine and transmission management software and vehicle sensors to detect when the vehicle is undergoing emissions testing. The Defeat Device then fully employs the vehicle systems to reduce $CO_2$ to legally compliant levels.

28.     The Defeat Device only engages during test cycles.

29.     Audi was successful in perpetrating this deception by programming its engines with the ability to engage different "modes." One used significantly less fuel and emitted significantly less CO2, but also delivered significantly less power. Audi deceptively coined this as the "warm-up" strategy – a mode that activates when the vehicles are started. As long as the "warm-up" function remains activated, the automatic transmission remains in a "switching program" that produces a low engine speed, consumes less fuel, and produces less CO2.

30.     Audi also configured a second method of activating this low fuel/low emissions/low power mode during regulatory testing. Audi engineers concluded that the only time the vehicles would run continuously with no steering wheel input would be when the vehicles were undergoing examination in a laboratory environment, and while operated on a test bed.

31.     The vehicles' transmission control modules ("TCM"), therefore, set "shift points" that allowed the vehicles to detect those lab conditions and to produce compliant emission results under those conditions (termed by Audi as the "Dyno Calibration" mode).[1] Under these static dynamometer lab conditions (a vehicle

---

[1] The Defeat Device software is imbedded in the TCM. The TCM's primary function is to establish shift logic by reacting to signals from sensors monitoring coolant temperature, exhaust temperature, ignition timing, crankshaft and camshaft positioning, fuel mixture and air flow volumes. The TCM and engine control unit (the "ECU") work in tandem to execute the actual defeat function. The engineers imbedded the defeat software in the TCM unit, intentionally making its detection less probable.

14

treadmill), the Defeat Device enables the Affected Vehicles to operate in that low power mode.

32.     The Dyno Calibration mode, also known as the "Low CO2" Program" works by causing the vehicle to shift gears prematurely to maintain artificially low engine revolutions and, therefore, fewer emissions.

33.     At times when the vehicles are being road driven under normal usage conditions, the transmission computer switches to "Road Calibration" mode which offers full power to the driver and which results in increased fuel consumption and greater CO2 emissions.  The Road Calibration mode activates when the driver turns the steering wheel fifteen degrees – an event which occurs immediately under normal driving conditions.

34.     This Defeat Device scheme allowed Audi to deceptively misrepresent the vehicles' fuel consumption and CO2 emissions to governmental authorities and to the consuming public.

35.     A vehicle's advertised fuel economy, which is listed on the "Monroney sticker" or window sticker, is determined by driving a vehicle over standardized driving patterns (or drive cycles), all of which are performed in a laboratory on a dynamometer where the conditions for tests can be controlled.

36.     These driving cycles include cold starts, hot starts, highway driving, aggressive and high speed driving, driving with the air conditioner in use and driving

during cold temperatures. Data from the five drive cycles are combined and adjusted for "real world" conditions to represent city driving and highway driving. The combined fuel economy is the average of the city and highway values with weights of 55% and 45%, respectively. These adjusted and combined values appear on the vehicle's Monroney sticker.

37.    During each of the drive cycles (all of which are performed in laboratory conditions, with the vehicles' low power/low emissions/low fuel consumption mode fully engaged), the amount of each pollutant is measured.  This includes un-combusted or partially combusted gasoline hydrocarbons (HC), carbon monoxide (CO), and $CO_2$. The amount of carbon produced is then converted to the amount of gasoline which was required to produce the carbon in the exhaust. The amount of gasoline expended during testing is divided into the distance driven on the test to produce the fuel economy.

38.    Based on this equation, as the amount of $CO_2$ produced increases, the gasoline used also increases while the fuel economy decreases.  Therefore, if a vehicle produced less $CO_2$, during laboratory testing, but higher $CO_2$, when driven on the road, the vehicle would have better estimated fuel economy represented on the Monroney sticker than the vehicle would actually achieve on the road.

39.    This is precisely the effect that was intended. The Defeat Device program equips the vehicles with two modes or personalities. The "Dyno

Calibration" personality reduces fuel supply and limits revolutions per minute ("rpm") per gear, reducing fuel burn and lowering emissions. This personality was engaged during all of the laboratory testing employed to falsely calculate the vehicles' anticipated fuel economy. The "Road Calibration" personality, in contrast, allows the engine to turn at maximum rpms in each gear and provides the necessary, and much higher, fuel supply required to deliver advertised torque and performance. This is the personality engaged during all normal driving conditions.

40.    This is not the first time Audi's parent company, Volkswagen, has been found culpable of using a Defeat Device.  In September 2015, the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") announced that Volkswagen  had, for years, been perpetrating an illegal scheme to conceal the true emissions of both their Audi and Volkswagen "Clean Diesel" vehicles by equipping them with a Defeat Device. That Defeat Device allowed the implicated diesel vehicles to detect government testing conditions and emit lower nitrous oxide ("NOx") during testing.  At all other times, the diesel engines emitted NOx well exceeding legal limits. The litigation which followed the discovery of these events, resulted in an agreement by Volkswagen to pay $14.7 billion dollars as compensation for the economic and environmental damages. This settlement is one of the largest consumer settlements in United States history.

41.    Audi was unquestionably  aware that emission and fuel consumption

were well known and decisive factors motivating consumer purchase decisions. Nonetheless, Audi fraudulently represented to the public that its vehicles used less fuel and emitted less CO2 than they actually do under normal driving conditions.

42.    Further, as late as September 2015, Volkswagen Group of America, Inc.,[2] had the temerity to represent (in the "Environment" section of its website), that it takes:

> "environmental responsibility very seriously. When it comes to making our cars as green as possible, Audi has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives."

Nothing could have been further from the truth.

43.    The installation of the Defeat Device could only have been done intentionally. Audi commissioned its own study which found that a vehicle's fuel consumption on the road increased by 8.5% after the steering wheel was turned.

44.    Audi and Audi management routinely discussed the Defeat Device software in detail. According to the minutes of a "Summer Drive" event in South Africa during the second half of February 2013, Axel Eiser, then the head of Audis powertrain division (and currently the head of powertrain development for the entire Volkswagen group) asked:

---

[2] Audi AG is the parent of Audi of America, LLC and a subsidiary of the Audi Group, which is a wholly owned subsidiary of Volkswagen AG. Audi AG directly controls and directs the actions of Audi of America, LLC.

"When will we have the cycle optimized shift program?" He continued: "The shifting program shall be designed to be 100% active on the dyno, but only 0.01% in the hands of the customer."

45.     The widespread use of the Defeat Device and its complex implementation make it certain that high-level Audi executives knew of its existence and its inclusion in the design and manufacture of its vehicles.

46.      Defendants also took steps to ensure that its employees did not reveal the details of their deception to regulators or consumers, including, Plaintiffs and Class Members. This deception continued even as Defendants made feigned apologies for utilization of the Defeat Device once detected.

47.     Defendants perpetrated their deception in order to advance the market status of their vehicles, (including, certified previously-owned vehicles) and to falsely assure purchasers and lessors of the design integrity, superiority and regulatory compliance of their vehicles.

48.     The Clean Air Act has strict emission standards for vehicles and requires that manufacturers certify to the EPA that vehicles sold in the United States meet applicable federal emissions standards enacted to control air pollution. Every vehicle sold in the United States must be covered by an EPA-issued certificate of conformity. Under federal law, cars equipped with Defeat Devices, which reduce the effectiveness of emissions control systems during normal driving conditions, cannot be certified by the EPA. By manufacturing and selling cars with Defeat Devices that

allowed for higher levels of emissions than the EPA permits, and by certifying to the EPA that such vehicles were compliant with the Clean Air Act, Audi violated the Clean Air Act, defrauded its customers, and engaged in unfair competition under Florida and federal law.

49.    Audi intentionally designed and sold cars that misled both consumers and regulators about the amount of pollution that the Affected Vehicles created and the fuel efficiency that they produced.

## F.  **CLASS ACTION ALLEGATIONS:**

50.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and on behalf of the Classes defined as:

**Nationwide Class**.  All persons and entities within the United States (including its Territories and the District of Columbia) that purchased or leased an Affected Vehicle are Class Members.

51.    In the alternative to the Nationwide Class, and pursuant to Rule 23(c)(5) of the Federal Rules of Civil Procedure, Plaintiffs also seek to represent the following state Class as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**Florida Class:**  All persons and entities in the State of Florida that purchased or leased an Affected Vehicle are Class Members.

52.    Excluded from the Classes are Audi, as well as Audi's employees,

affiliates, officers, and directors, including franchised dealers, any individuals who experienced physical injury as a result of the defect at issue in this litigation, and the judge and court staff to whom this case is assigned.

53.   Plaintiffs reserve the right to modify and/or add to the Nationwide and/or State Classes prior to class certification.

54.   **Fed. R. Civ. P. 23(a) Prerequisites:**

a. **Numerosity**.  Both the Nationwide and Florida Classes are so numerous that joinder of all members is impracticable.  Although the precise number of Class Members is unknown and is within the exclusive control of Audi and its affiliated dealerships, Audi has sold at least 200,000 vehicles in the United States, including, thousands in the State of Florida.

b. **Commonality**.  The claims of Plaintiffs and the Nationwide and Florida Classes involve common questions of fact and law that will predominate over individual issues. These common questions include, but are not limited to:

(1)  whether the vehicles that Audi designed, manufactured, marketed, distributed, leased, and/or sold contained a concealed Defeat Device and emitted unlawful levels of $CO_2$ during their normal use;

(2)  whether Audi designed, manufactured, marketed, distributed, leased, and/or sold the vehicles and/or their emissions-related systems, including Defeat Devices, in the United States;

(3)  whether Audi knew or should have known of the Defeat Device at the time of designing, marketing, distributing, leasing, and/or selling the vehicles;

(4)  whether Audi knew or should have known that its representations regarding the emissions and/or fuel efficiency of the vehicles were false at the time of designing, marketing, distributing, leasing, and/or selling the vehicles;

(5)  whether the true nature of the vehicles' performance, emissions levels, fuel economy, and the inclusion of the Defeat Device constitute material facts that reasonable consumers would have considered in deciding whether to purchase a vehicle;

(6)  whether Audi's conduct violates consumer protection and other laws as asserted herein;

(7)  whether Plaintiffs and the other Class Members overpaid for their vehicles and incurred other damages allowable under the various causes of action sued on.

(8)  whether Audi had a duty to disclose the true nature of the vehicles to Plaintiffs and the other Class Members;

(9)  whether Audi omitted, actively concealed, and/or failed to disclose material facts about the vehicles;

(10)  whether concealment of the true nature of the vehicles would have induced a reasonable consumer to act to their detriment by purchasing and/or

leasing the vehicles;

(11)  whether the vehicles can be manufactured to comply with federal and state emission standards without degrading their performance and/or efficiency;

(12)  whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to: restitution, injunctive relief, and all other damages allowed by the various causes of action sued on.

(13)  whether Plaintiffs and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

c.  **Typicality**.  Plaintiffs' claims are typical of Nationwide and State Class Members' claims.  As described herein, Plaintiffs and the other Class Members purchased or leased vehicles, which were designed, manufactured, marketed, distributed, leased, and/or sold by Audi.  Plaintiffs and the other Class Members have been damaged by Audi's illegal conduct.  Plaintiffs and the other Class Members have incurred similar or identical losses relating to the vehicles.  Furthermore, the factual bases of Audi's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

d.  **Adequacy**.  Plaintiffs will fully and adequately represent and protect the interests of the Nationwide and State Classes because they share common interests with Class Members as a result of Audi's illegal conduct.

23

55.     Plaintiffs have retained counsel with experience in complex, commercial, multi-party, consumer, and class action litigation. Plaintiffs' counsel has prosecuted numerous complex class actions, including, those involving defective automobiles, in state and federal courts.

56.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

57.     **Fed. R. Civ. P. 23(b) Prerequisites**

a.  **Predominance.**  Questions of law and fact common to the Nationwide and State Classes, including those listed above, predominate over questions affecting individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual damages on the matter can be readily calculated. Thus, the question of individual damages will not predominate over legal and factual questions common to the Nationwide and State Classes. Additionally, Audi has acted or refused to act on grounds that apply generally to the Nationwide and State Classes, so that final injunctive relief and/or corresponding declaratory relief is appropriate with respect to the Nationwide and State Classes.

c.  **Superiority**.  Audi's scheme treated consumers as a Class to be uniformly deceived.  A class action is superior to all other available methods for the

fair and efficient adjudication of this controversy.  Plaintiffs and Class Members have all suffered and will continue to suffer economic harm and damage as a result of Audi's unlawful and wrongful conduct, which was directed toward Class Members and the public as a whole, rather than specifically or uniquely against any individual Class Members.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. The undersigned is unaware of any individual claims filed by class members other than those brought by Plaintiffs herein and one other individual filed in the United States District Court, Southern District of California.

Consequently, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without effective remedy.

58.   **<u>Declaratory and Injunctive Relief</u>**.  Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure because Audi has acted on grounds that apply generally to the Class, and inconsistent adjudications with respect to Audi's liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests. Classwide relief and Court supervision under Rule 23 assures fair, consistent, and equitable treatment and protection of all

Class Members, and uniformity and consistency in Audi's discharge of its duties to perform corrective action regarding the vehicles.

## G.  CLAIMS BROUGHT ON BEHALF OF PLAINTIFFS AND MEMBERS OF THE CLASSES

### COUNT I – Violation of the Racketeer Influenced And Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962(c))

59.    Plaintiffs re-allege and incorporate by reference all preceding Paragraphs as though fully set forth herein.

60.    The Defendants are all "persons" under 18 U.S.C. § 1961(3).

61.    The Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the RICO Enterprise through a pattern of repeatedly defrauding consumers. The methodology of the fraud is set forth above and as described in this Count. The persons participating in the Enterprise and their respective roles in the Enterprise are set forth below.

62.    For purposes of this Count, Defendants Audi AG and Audi of America, LLC are co-conspirators. The conspiracy undertook a fraudulent scheme to create a Defeat Device and to install it in Affected Vehicles that were sold in Florida, throughout the United States, and elsewhere through the use of false and misleading statements and omissions relating to the qualities of the emissions controls installed in those vehicles. Those false and misleading statements and omissions were

conveyed through the use of the U.S. Mail, interstate and international wire, radio, and television transmissions.

63.   At all relevant times and as described above, Defendants carried out their scheme to defraud Plaintiffs and Class Members in connection with the conduct of an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

64.   The Enterprise consisted of Defendants, and others presently unknown, who constituted an "association-in-fact enterprise" within the meaning of RICO and who collectively constituted the ("The Enterprise").

65.   The Enterprise (the activities of which affected interstate and foreign commerce) is an association-in-fact, consisting of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and is comprised of of persons associated together for the common purpose of selling the Affected Vehicles to Plaintiffs and Class Members.

66.   The Enterprise was formed in 2008 or earlier and continued to at least May 2016, if not later.  The RICO Enterprise engaged in a pattern of racketeering activity by selling the Affected Vehicles to Plaintiffs and Class members thereby putting the Affected Vehicles into commerce over an eight-year period, from 2008 to May 2016 or later.  As a result, Defendants were able to collect billions of dollars of illicit profits.

67.   The Fraudulent  Enterprise is separate and distinct from the pattern of

racketeering activity. The Enterprise is an ongoing organization or group and exists to advance the interests of the individual entities that comprise its membership, by selling the Affected Vehicles to the Class Members described above. From 2008 through May 2016 or later, the Fraudulent Enterprise members all served the common purpose of shipping and selling as many fraud-laden vehicles as possible in Florida, the United States and elsewhere therein maximizing their own profits and revenues and sharing the billions of dollars in illicit gains derived from deceived and defrauded consumers.

68.    Each member of the Fraudulent Enterprise benefited from the common purpose.  Audi sold more Affected Vehicles to Plaintiffs and Class Members, and received more for those vehicles than they otherwise would have, had the Affected Vehicles sold to Plaintiffs and Class Members been truthfully advertised, marketed and labeled.

69.    The Fraudulent Enterprise also exists for the legitimate purpose of selling vehicles with software that does not allow those vehicles to evade emissions standards. It operates within a framework that includes the sale of other consumer goods that are not infected with fraud.  Each member of the Enterprise performs a role in the group consistent with its structure that furthers the activities of the Fraudulent Enterprise in connection with the Enterprise members' sale of EPA-compliant vehicles to consumers.

70.    Alternatively, Defendants are RICO co-conspirators and as part of  that conspiracy, they undertook a fraudulent scheme to create a Defeat Device and to install it in Affected Vehicles that were sold to Plaintiffs and Class Members in Florida, the United States and elsewhere by Audi of America.  The sale of these Affected Vehicles was accomplished through the use of false and misleading statements, conveyed through the use of the U.S. Mails, interstate and international wire, and radio and television transmissions,  as well as through omissions relating to the qualities of the emission controls installed in the Vehicles.

71.    At all relevant times and as described above, Defendants carried out their scheme to defraud Plaintiffs and Class Members in connection with the conduct of an alternative "enterprise" within the meaning of 18 U.S.C. § 1961(4).   The Alternative Enterprise consisted of Audi of America, LLC.

72.    The conduct of the Enterprise or alternative Enterprise was a conduit through which Defendants undertook a fraudulent scheme to sell the Affected Vehicles to Plaintiffs and Class Members based upon the false and misleading misrepresentations and omissions set forth herein.

73.    Through this scheme,  Defendants and others agreed to utilize the false and misleading representations and omissions relating to the Affected Vehicles sold to Plaintiffs and Class Members in a conscious and deliberate effort to sell products

(vehicles) at a premium price that, in fact, provided no benefit whatsoever to the purchaser and/or user of the products.

Additionally, the fraudulent efficacy claims applied to the products did not have the possibility of providing the promised results thereby causing the Affected Vehicles to have significantly less value than the amount paid for them by the consumers.

74.   As is set forth above, Defendants knowingly participated in the formulation and manufacture of the Defeat Device software, as well as in the preparation of the false marketing materials used to sell the Affected Vehicles to Plaintiffs and Class Members.

75.   At all times relevant to this case,  Defendants were willing and deliberate participants in the Enterprise or alternative Enterprise.

76.   The Enterprise and alternative Enterprise were, at all relevant times, a continuing unit functioning with a common purpose of selling Affected Vehicles to Plaintiffs and Class Members through the use of the false and misleading representations and omissions described above, and those omissions identified below, in order to increase sale of the Affected Vehicles and thereby increase Defendants' profits.

77.   In furtherance of the scheme, Defendants (facilitated by and in concert

with others) engaged in thousands of acts of mail fraud and wire fraud, each of which constitute "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1).

78. Those acts of mail fraud and wire fraud generally include the:

(a) distribution of false and misleading marketing materials described herein by mail, television, radio, and the Internet to members of the public; as well as the

(b) communication among themselves (Defendants) with respect to the scheme by interstate and international email and telephone with the common purpose of selling the Affected Vehicles to Plaintiffs and Class Members (an unsuspecting public) based upon the fraudulent and deceptive representations and omissions described herein.

79. In addition to the foregoing, each download or view of one of the Defendants' advertisements and videos on the Internet constitutes a separate offense of wire fraud.

80. As a result of the foregoing, Plaintiffs and Class Members have been injured in their business and/or property in that they paid for Affected Vehicles that did not and could not provide the benefits promised in the advertisements and other promotional materials associated with the products. Their out-of-pocket losses are a direct result of the predicate acts described above.

The Audi Defendants' marketing and their numerous false and misleading statements (along with advertisements that contained omissions) sent via the U.S. mail and interstate wires were directed to Plaintiffs and Class Members and  were thereby relied on by them to their detriment.  But for Defendants' numerous false and misleading statements (and marketing and advertising omissions) sent via the U.S. mail and interstate wires, neither Plaintiffs nor Class Members would have paid the higher price for the Affected Vehicles, nor would they  have purchased the Affected Vehicles at all.

Plaintiffs and Class Members have been damaged and demand all relief awardable pursuant to this cause of action, including, compensation for the monetary difference between the vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages; statutory costs, attorney fees; and all other relief allowed by law.

**COUNT II** – **Violation of Magnuson Moss Warranty Act, 15 U.S.C. SS2301, et. seq.  (On Behalf of the Nationwide Class or in the Alternative the Florida Class)**

81.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

82.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 2301(3).

83. Audi's Affected Vehicles sold to Plaintiffs and Class Members are "consumer products," as that term is defined in 15 U.S.C. § 2301(1).

84. Plaintiffs and Class Members are "consumers," as that term is defined in 15 U.S.C. § 2301 (1) and (3).

85. Audi is a "warrantor" and a "supplier," as those terms are defined in 15 U.S.C. §§ 2301(4) and (5), respectively, because the company regularly sells Audi vehicles accompanied by the written Limited Warranties.

86. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

87. Audi provided Plaintiffs and Class Members with two "warranties" as that term is defined in 15 U.S.C. § 2301(7):

a. a "bumper-to-bumper" limited express warranty coverage for a minimum of four years or 50,000 miles, whichever comes first, and which covers emission-related repairs; and

b. a federal emissions warranty that covers the repair and replacement of all emission control and emission-related parts for two years or 24,000 miles (whichever comes first), and also covers specified major emission control components, including, catalytic converters, electronic emissions control units or computer and on-board emissions diagnostic devices or computers for eight years or 80,000 miles (whichever comes first). These express warranties constitute

written warranties within the meaning of 15 U.S.C. § 2301(6). The vehicles' implied warranties are covered by 15 U.S.C. § 2301(7).

88.     The terms of both the written and implied warranties became part of the basis of the bargain between Plaintiffs, Class Members and Defendants when Plaintiffs decided to purchase a vehicle.

89.     Audi breached these written express and implied warranties as described in detail above.  Without limitation, the vehicles share a common design defect in that they emit more CO2 than:

     a.     is allowable under the applicable regulations; and

     b.     was represented by Audi to their customers, the public, and regulators.

90.     Plaintiffs and the Class Members have had sufficient direct dealings with either Audi or its agents (including Audi dealerships) to establish privity of contract between them.  Nonetheless, privity is not required here because Plaintiff and the Class Members are intended third-party beneficiaries of contracts between Audi and its dealers, and specifically, of Audi's implied warranties. The dealers were not intended to be the ultimate consumers of the vehicles and have no rights under the warranty agreements provided with the vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

91.     Affording Audi a reasonable opportunity to cure its breach of

written warranties would be unnecessary and futile. At the time of sale or lease of each vehicle, Audi knew, should have known, and/or was reckless in not knowing of its misrepresentations concerning the vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the design defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs or the Class Members resort to an informal dispute resolution procedure affording Audi a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

92. As a direct and proximate result of Audi's breach of the written warranties and the implied warranty of merchantability, Plaintiff and Class Members have suffered damages.

93. Plaintiffs and Class Members demand all damages awardable pursuant to this cause of action, including, compensation for the monetary difference between the vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages; statutory attorney fees; and all other relief allowed by law.

94. Audi has breached these implied warranties as described in more

detail below. Without limitation, Audi's Affected Vehicles sold to Class Members are defective, as described herein, which resulted in the problems and failures also described herein.

95. By Audi's conduct as described in this Complaint, including, Audi's knowledge of the defects inherent in the Affected Vehicles sold or leased to Class Members and its action, and inaction, in the face of this knowledge, Audi has failed to comply with its obligations under its written and implied promises, warranties, and representations.

96. In its capacity as a warrantor, and by the conduct described herein, any attempts by Audi to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective software and supporting systems is null and void.

97. All jurisdictional and other prerequisites to bringing this action have been complied with, satisfied or waived.

98. Plaintiffs are in privity with Audi in that they purchased the Defeat Device software from Audi or its agents.

99. As a result of Audi's breach of implied warranties, Plaintiffs and Class Members are entitled to revoke their acceptance of the vehicles. Further, Plaintiffs and Class Members demand all damages awardable pursuant to this cause of action,

including, punitive and treble damages; compensation for the monetary difference between the vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages; statutory costs and attorney fees; and all other relief allowed by law.

## COUNT III – Unjust Enrichment

100.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

101.   Plaintiffs and Class Members conferred a benefit on Defendants by, inter alia, using (and paying for) their vehicles.

102.   Defendants have retained this benefit, and know of and appreciate this benefit.

103.   Defendants were and continue to be unjustly enriched at the expense of Plaintiffs and Class Members.

104.   Defendants should be required to disgorge this unjust enrichment.

## COUNT IV – Fraud by Concealment

105.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

106.   Defendants intentionally concealed and suppressed material facts

concerning the quality and character of the Affected Vehicles sold to Plaintiffs and Class Members.  As alleged in this Complaint, Defendants engaged in deception to evade federal and state vehicle emissions standards by installing Defeat Device software designed to conceal its vehicles' emissions of the pollutants.

107.    The software installed in the Affected Vehicles sold to Plaintiffs and Class Members was fraudulently designed to be activated only during emissions testing, such that the vehicles would show far lower emissions during testing than when actually operated on the road. The result, as Defendants intended, was that vehicles passed emissions testing and received the requisite certifications by way of deliberately-induced false readings.

108.    Plaintiffs and Class Members reasonably relied upon Audi's false representations when deciding whether to purchase an Affected Vehicle.  They had no way of knowing that Audi's representations were false and gravely misleading. As alleged herein, Audi employed extremely sophisticated methods of deception, such that Plaintiffs and Class Members did not, and could not, unravel Audi's web of deception.

109.   Audi concealed and suppressed material facts concerning the true culture of Audi – one characterized by an emphasis on profits and sales above compliance with emissions regulations that are meant to protect consumers and the public at large. Defendants also placed more value on profits than they did on maintaining the trust

that Plaintiffs had in Audi's representations about the Affected Vehicles sold to Plaintiffs and Class Members. Such crucial representations and omissions have left consumers angered and betrayed.

110. Audi also took steps to ensure that its employees did not reveal the details of its deception to regulators or consumers, including, Plaintiffs in this case. Audi made this strategic decision in order to:

a. falsely assure consumers that Audi is a reputable manufacturer that complies with applicable law, including, federal and state clean air law and emissions regulations, and;

b. falsely assure consumers that its vehicles likewise comply with applicable law and regulations, and;

c. boost the reputations of its vehicles and to falsely assure purchasers and lessors of the mechanical integrity of those vehicles, including, certified previously-owned vehicles.

111. Audi's false representations were material to consumers, not only because these misrepresentations concerned the quality of the Affected Vehicles sold to Plaintiffs or Class Members, but also because they misrepresented their lack of compliance with applicable federal and state laws and regulations regarding clean air and emissions, and because the misrepresentations played a significant role in assessing the value of the Affected Vehicles sold or leased to Plaintiffs and Class

Members.    As Audi well knew, its customers, including, Plaintiffs and Class Members  highly valued the belief that the vehicles they were purchasing or leasing were clean cars, and paid accordingly.

112.    Audi had a duty to disclose the emissions deception in which it engaged with respect to the Affected Vehicles sold or leased to Plaintiffs and Class Members because: (a) knowledge of the deception and its details were known and accessible only to Audi; (b) Audi had exclusive knowledge as to the implementation and maintenance of its deception; and (c) Audi knew that the facts surrounding the deception were unknown to and unable to be reasonably discovered by Plaintiffs and Class Members.

113.    Audi also had a duty to disclose its sophisticated deception of emissions testing because the company made general affirmative representations about the qualities of its vehicles with respect to emissions standards, starting with references to the Affected Vehicle as "Clean" cars, or cars with clean gasoline engines. Such references were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth herein regarding Audi's emissions deception, the actual emissions of its vehicles, its actual philosophy with respect to complying with federal and State clean air law and emissions regulations, and its actual practices with respect to the Affected Vehicles.

114.    Having volunteered to provide information to Plaintiffs, Audi had

40

a duty to disclose the entire truth.  All of the facts omitted and concealed by Audi are material because they directly affect the value of the Affected Vehicles. Whether a manufacturer's products comply with federal and state clean air law and emissions regulations, whether that manufacturer is honest about such compliance or non-compliance, and whether the vehicles passed the requisite emissions testing in order to receive compliance certification, are material concerns to a consumer. Audi represented to Plaintiffs and Class Members that they were purchasing clean gasoline vehicles, and that emissions testing had confirmed this. To the contrary, however, Audi had thoroughly subverted the entire emissions testing process.

115.   Audi actively concealed and/or suppressed these material facts, in whole or in part, to expand and protect its profits, and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions, which perception would damage the brand's image and be financially corrosive to Audi. Audi concealed these material facts at the expense of Plaintiffs and Class Members.

116.   On information and belief, Audi has still not made full and adequate disclosures, and continues to defraud consumers by concealing material information regarding the emissions qualities of its referenced vehicles and the company's systematic emissions deception.

117.    Plaintiffs and Class Members were unaware of the omitted material

facts. They would not have purchased the Affected Vehicles from Audi, and would not have continued to drive their heavily-polluting vehicles. Audi was in exclusive control of the material facts, and such facts were not made known to the public, Plaintiffs or Class Members.

118. Had Plaintiffs been aware of the serious issues generated by Audi's deceptive corporate policies, the emissions deceptions with regard to the Affected Vehicles sold to Plaintiffs and Class Members, or the company's callous disregard for compliance with applicable federal and state laws and regulations, Plaintiffs and Class Members who purchased Affected Vehicles would have paid less for those vehicles or would not have purchased them at all.

119. The value of Plaintiffs' vehicles has diminished as a result of Audi's fraudulent concealment. Not only has Audi's fraud greatly tarnished the Audi brand name attached to Plaintiffs' vehicles and made any reasonable consumer reluctant to purchase any of the Affected Vehicles sold to Plaintiffs and Class Members, let alone pay what otherwise would have been fair market value for those vehicles.

120. By Defendants' intentional misconduct, they had actual knowledge of the wrongfulness of the conduct and the high probability that such conduct would result in injury or damage to claimants and, despite that knowledge, intentionally pursued a course of conduct that did in fact result in injury or damage.

121.    Plaintiffs and Class Members demand all damages awardable pursuant to this cause of action, including, punitive damages pursuant to Florida's Punitive Damages Statute, Fla. Stat. §768.72(1)(2)(2015).

**COUNT V – Breach of Contract**

122.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

123.    Audi's misrepresentations and omissions alleged herein, including, Audi's failure to disclose the existence of the Defeat Device, were intended to cause and did cause Plaintiffs and Class Members to purchase the Affected Vehicles. Absent those misrepresentations and omissions, Plaintiffs and Class Members would not have purchased the Affected Vehicles. Instead, they would have paid substantially less for the Affected Vehicles and/or would have purchased less expensive alternative vehicles that did not contain the Clean gasoline engine systems. Accordingly, Plaintiffs and Class Members did not receive the benefit of their bargain.

124.    Each and every sale of an Affected Vehicle to Plaintiffs and Class Members constitutes a separate contract between Audi and the purchaser. Audi breached these contracts by selling or leasing to Plaintiffs and Class Members defective vehicles and by misrepresenting or failing to disclose the existence of the Defeat device, including, information known to Audi that rendered each Affected

Vehicle less safe and emissions-compliant and thus less valuable than vehicles not equipped with Clean gasoline engine systems.

125.   As a direct and proximate result of Audi's breach of contract, Plaintiffs and Class Members have been damaged, and demand all damages allowable pursuant to this cause of action.

**COUNT VI – Breach of Express Warranty**

126.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

127.   Defendants made numerous representations, descriptions, and promises to Plaintiffs and Class Members regarding the performance and emission controls of the Affected Vehicles.

128.   Defendants, however, knew or should have known that their representations, descriptions, and promises were false. Defendants were well aware that they had installed Defeat Devices in the Affected Vehicles they sold to Plaintiffs and Class Members.

129.   Plaintiffs and Class Members reasonably relied on Audi's representations in purchasing "clean" gasoline vehicles. Those vehicles, however, did not perform as warranted. Unbeknownst to Plaintiffs and Class Members, the vehicles included devices that caused their emission reduction systems to perform at non-compliant levels. Accordingly, Audi breached its express warranty by providing

a product containing defects that were never disclosed to the Plaintiffs or Class Members.

130.   As a direct and proximate result of Audi's false and misleading representations and warranties,  Plaintiffs and Class Members have incurred  damages and demand all relief allowable pursuant to this cause of action.

**COUNT VII – Breach of lmplied Warranty**

131.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

132.   Audi made numerous representations, descriptions, and promises to Plaintiffs and Class Members assuring the functionality, merchantability, and fitness for the purpose sold of Audi's "clean" gasoline technology.

133.   Plaintiffs and Class Members reasonably relied on Audi's representations in purchasing the Affected Vehicles.

134.   As set forth throughout this Complaint, Audi knew that its representations, descriptions, and promises regarding its gasoline driven engines were false.

135.   When Plaintiffs and Class Members purchased Audi's Affected Vehicles, those vehicles did not  conform to the promises or affirmations of fact made in Audi's promotional materials, including, that the vehicles were designed to meet the most demanding environmental standards. Instead, as alleged herein, those vehicles were

designed to defeat compliance with those standards, and the Affected Vehicles emitted far higher levels of pollution than promised.

136.   Accordingly, the Affected Vehicles failed to conform to Audi's implied warranty regarding their functionality.

137.   As a direct and proximate result of Audi's false and misleading representations and warranties, Plaintiffs and Class Members suffered  damages and seek all relief provided by this cause of action.

### COUNT VIII – Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201, et seq.)

138.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

139.   Plaintiffs and Class Members  are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §501.203(7).

140.   Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

141.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204(1). Defendants participated in unfair and deceptive trade practices that violated FDUTPA, as described herein.

142.   In the course of their business, Defendants failed to disclose and

actively concealed the risks both to the environment and also to the health of the general public posed by the installation of Defeat Devices in the Affected Vehicles as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

143.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Affected Vehicles.

144.   The Audi Defendants have known of the illegality of Defeat Devices since at least 2008. Nevertheless, Defendants failed to disclose and actively concealed the presence of Defeat Devices in the Affected Vehicles as well as the risks associated with their use.

145.   By failing to disclose and by actively concealing the presence of Defeat Devices in the Affected Vehicles, by marketing those vehicles as safe, reliable, and of high quality, and by presenting themselves as reputable companies that value honesty and environmental sustainability, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld information about the propensity of the Affected Vehicles to emit greater amounts of

CO2 than allowable by law in order to ensure that consumers would purchase the Affected Vehicles.

146.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the risks, both to the environment and to the health of the general public, posed by the installation of defeat devices in the Affected Vehicles. Defendants compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, and of high quality, and by claiming to be reputable companies that value honesty and environmental sustainability.

147.   Defendants' unfair or deceptive acts or practices, including the aforesaid concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, and to create a false impression in the minds of consumers; these same acts or practices were likely to and did in fact deceive reasonable consumers, including, Plaintiffs and Class Members, about the true safety and reliability of the Affected Vehicles, the quality of Defendants' brands, and the true value of the Affected Vehicles.

148.   Defendants intentionally and knowingly misrepresented material facts regarding the Affected Vehicles with an intent to mislead Plaintiffs and class members.

149.   Defendants knew or should have known that their conduct violated the FDUTPA.

150.    As alleged above, Defendants made material statements about the safety and reliability of the Affected Vehicles that were either false or misleading.

151.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the risks posed by the Affected Vehicles and allowed unwary consumers to continue to purchase the Affected Vehicles.

152.    Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Affected Vehicles because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing, generally, while purposefully withholding material facts from Plaintiffs and Class Members  that contradicted these representations.

153.    Because Defendants fraudulently concealed the installation of Defeat Devices in the Affected Vehicles, resulting in a raft of negative publicity once the emissions scandal finally started coming to light, the value of the Affected Vehicles was greatly diminished.  In light of the stigma attached to the Affected Vehicles by Defendants' conduct, the same Affected Vehicles are now worth significantly less than they otherwise would be.

154.    Defendants' failure to disclose their active concealment of the risks

posed by the installation of Defeat Devices in the Affected Vehicles was material to Plaintiffs and Class Members. A vehicle made by a reputable company that produces safe vehicles that comply with the law is worth more than an otherwise comparable vehicle made by a disreputable company that produces unsafe vehicles and schemes to avoid federal and state laws and regulations for its own material gain.

155.    Plaintiffs and Class Members suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the installation of Defeat Devices in the Affected Vehicles, and Defendants' complete disregard for the law, Plaintiffs and Class Members would have either paid less for their vehicles or would not have purchased them at all. Plaintiffs and Class Members  did not receive the benefit of their bargain as a result of Defendants' misconduct.

156.    Plaintiffs and Class Members risk irreparable injury as a result of Defendants' acts and omissions in violation of the FDUTPA, and these violations present continuing risk to Plaintiffs, Class Members and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

157.    As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs have suffered injury-in-fact and/or actual damage.

158.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. §

501.211(2) and costs and attorneys' fees under Fla. Stat. § 501.21 05(1), and all other damages permitted by this cause of action.

159.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, unconscionable and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**COUNT IX – Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.976)**

160.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

161.    Plaintiffs and Class Members are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §501.203(7).

162.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

163.    Defendant Audi is a "motor vehicle dealer" within the meaning of Fla. Stat. § 501.975(2) and  Fla. Stat. § 320.27 (1) (c).

164.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204(1).    Defendants participated in unfair and deceptive trade practices that violated FDUTP A in the following respects:

    a.    **§ 501.976(4)** of the Florida Deceptive and Unfair Trade Practices

Act provides that it is an unfair or deceptive act or practice actionable under FDUTPA for an automobile dealer to "represent the quality of care, regularity of servicing or general condition of a vehicle unless known by the dealer to be true and supportable by material fact."

(1) Plaintiffs were defrauded by Defendants' false representations regarding the "general condition of a vehicle" caused by the installation of emission Defeat Devices in the Affected Vehicle Class Members.

(2) The scheme to defraud was cleverly crafted around the intentional installation of those devices on over 482,000 diesel Audi and Audi-branded vehicles sold in the United States, including, in the state of Florida, since 2008.

(3) As a result, Plaintiffs are entitled to damages and attorney fees as further provided herein.

b. § **501.976(7)** of the Florida Deceptive and Unfair Trade Practices Act provides that it is an unfair or deceptive act or practice actionable under FDUTPA for an automobile dealer to provide an express or implied warranty and then fail to honor such warranty unless the warranty was disclaimed pursuant to Section 501.976(6).

(1) Audi provided Plaintiffs with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).

(2) Audi has breached these implied warranties as described in more

detail above. Without limitation, Audi's Affected Vehicles are defective, as described herein, which resulted in the problems and failures also described herein.

(3) By Audi's conduct as described in this Complaint, including, Audi's knowledge of the defects inherent in the Affected Vehicles and its action and inaction in the face of this knowledge, Audi has failed to comply with its obligations under its written and implied promises, warranties, and representations.

(4) In its capacity as a warrantor, and by the conduct described herein, any attempts by Audi to limit the implied warranties in a manner that would exclude coverage of the defective software and systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective software and supporting systems is null and void.

(5) All jurisdictional prerequisites have been satisfied.

(6) Plaintiffs are in privity with Audi in that they purchased the Defeat Device software from Audi or its agents.

(7) Defendants made numerous representations, descriptions, and promises to Plaintiffs regarding the performance and emission controls of their diesel vehicles.

(8) Defendants, however, knew or should have known that their representations, descriptions, and promises were false. Defendants were well aware that they had installed Defeat Devices in the vehicles they sold to Plaintiffs.

(9)  Plaintiffs reasonably relied on Audi's representations in purchasing "clean" diesel vehicles. Those vehicles, however, did not perform as warranted. Unbeknownst to Plaintiffs, those same vehicles included devices that caused their emission reduction systems to perform at levels worse than advertised. Those same devices are defects. Accordingly, Audi breached its express warranty by providing a product containing defects that were never disclosed to the Plaintiffs.

(10)   As a direct and proximate result of Audi's false and misleading representations and warranties, Plaintiffs suffered significant damages.  As a further result of Audi's breach of this section, Plaintiffs and Class Members are entitled to all damages allowable under this cause of action, including, costs and attorneys' fees.

c.  § **501.976(19)** of the Florida Deceptive and Unfair Trade Practices Act provides that it is an unfair or deceptive act or practice actionable under FDUTPA for an automobile dealer "to fail to disclose damage to a new motor, as defined in **§ 319.001(9),** of which the dealer had actual knowledge, if the dealer's actual cost of repairs exceeds the threshold amount, excluding, replacement items."

(1) The Affected Vehicles are "damaged vehicles" for purpose of this section.

(2)  Defendants' concealments, omissions, and suppressions of damage had a tendency or capacity to mislead, and also created false impressions that were likely to and did in fact deceive reasonable consumers, including, Plaintiffs and the

54

Class Members about the damage caused by the Defeat Devices, the quality of Defendants' brands, and the true value of the Affected Vehicles.

(3) As a result, Plaintiffs are entitled to all damages pursuant to this cause of action, including, costs and attorney fees.

## COUNT X – Breach of Implied Warranty of Merchantability (Fla. Stat. §§ 672.314, et seq.)

165.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

166.    Defendants are and were at all times during the Relevant Period "merchants" with respect to motor vehicles within the meaning of Fla. Stat. § 672.104(1).

167.    A warranty that the Affected Vehicles were in merchantable condition was implied by law pursuant to Fla. Stat. § 672.314.

168.    The Affected Vehicles, when sold and at all times thereafter, were not merchantable or fit for the ordinary purpose for which cars are used. Specifically, they are inherently dangerous in that they emit into the air more $CO_2$ than is permissible under federal and state laws and regulations.

169.    Plaintiffs, at all times during the Relevant Period, were intended third-party beneficiaries of the:

    a.  sale of components for the Defeat Devices to the Audi Defendants; and

    b.  Audi Defendants' sale of Affected Vehicles to Plaintiffs.

170.   Defendants were aware of these issues by their knowledge of prior complaints filed against them and/or others, and by their own internal investigations.

171.   As a direct and proximate result of Defendants' breach of the warranties of merchantability and fitness for a particular purpose, Plaintiffs are entitled to damages, costs and attorney fees and all other damages permissible pursuant to this cause of action.

**COUNT XI – Violation of Fla. Stat §772.11 – Exploitation of an Elderly Person or Disabled Adult**

172.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

173.   Upon information and belief, it is alleged that some Plaintiffs and Class Members  are "elderly" and/or disabled persons as those terms are defined respectively in Fla Stat.§§ 825.101(4) and (5).

174.   Fla Stat. § 772.11 provides in pertinent part that:

(1) Any person who proves by clear and convincing evidence that he or she has been injured in any fashion by reason of any violation of §§ 812.012-812.037 or §825.103(1) has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts.

175.   Fla. Stat. §825.103(1) provides in pertinent part that:

(1)"Exploitation of an elderly person or disabled adult" means:
    (a) Knowingly obtaining or using, or endeavoring to obtain or use, an elderly person's or disabled adult's funds, assets, or property with the intent to temporarily or permanently deprive the elderly person or disabled adult of the use, benefit, or

possession of the funds, assets, or property, or to benefit someone other than the elderly person or disabled adult, by a person who:

    i.  Stands in a position of trust and confidence with the elderly person or disabled adult; or

    ii.  Has a business relationship with the elderly person or disabled adult.

176. Fla. Stat. §825.101 (1) defines a "business relationship" as a "relationship between two or more individuals or entities where there exists an oral or written contract or agreement for goods or services."

177. Plaintiffs and Class Members who constitute "elderly persons" and/or maintained a "business relationship" with Defendants have been damaged.

178. Defendants knowingly obtained or used, or endeavored to obtain or use, an elderly person's or disabled adult's funds, assets, or property with the intent to temporarily or permanently deprive the elderly person or disabled adult of the use, benefit, or possession of the funds, assets, or property, or to benefit someone other than the elderly person or disabled adult by fraud as follows:

a. Audi charges substantial premiums for the Affected Vehicles. Consumers may be agreeable to paying this premium when they are led to believe that they are driving a vehicle that is EPA compliant and environmentally friendly.

b. These premiums occur across the entire fleet of Affected Vehicles.

c. Elderly Persons and/or Disabled Adults were permanently deprived

of the additional premium funds charged for the Affected Vehicles as well as being permanently deprived of the use and benefit of the clean vehicle that they were led to believe that they had purchased. All of this loss inured to the benefit of Defendants.

d.  As a result, Plaintiffs and Class Members are entitled to all damages allowable pursuant to this cause of action including treble damages, costs and attorney fees.

**WHEREFORE,** Plaintiffs and Class Members respectfully request that the Court enter judgment in their favor and against Audi, for all allowable damages including but not limited to:

a.  An order temporarily and permanently enjoining Audi from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint.

b.  Mandatory injunctive relief in the form of a free replacement program, with such replacement program also providing for all damages proven, including, costs and attorney fees where otherwise awardable.

c.  Revocation of acceptance.

d.  Treble damages, consequential damages, actual damages, compensatory damages, special damages, disgorgement, punitive damages, costs and attorney fees as permitted by applicable laws and all statutory and common law

58

causes of action sued on, including, all damages awardable under the Magnuson-Moss Warranty Act.

e.  An order requiring Audi to pay both pre-judgment and post-judgment interest on any amounts awarded.

f.  Such other or further relief as may be appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial as to all issues so triable.

Dated:  April 19, 2017.

/s/ Samuel W. Bearman
Samuel W. Bearman
Florida Bar No. 216127
Law Office of Samuel W. Bearman, LC
820 North 12th Avenue
Pensacola, FL 32501
(850) 438-1000
sbearman@bearmanlaw.com
Attorney for Plaintiffs

/s/ John P. Kuder
John P. Kuder
Florida Bar No. 119443
Sellers Skievaski Kuder LLP
919 North 12th Avenue
Pensacola, FL 32501
(850) 434-3111
kuderj@bellsouth.net
Attorney for Plaintiffs

/s/ Artice L. McGraw
Artice L. McGraw
Florida Bar No. 112267
Artice McGraw, PA

817 North Palafox Street
Pensacola, FL 32501
(850) 438-4036
articelmcgraw@articelmcgraw.com
Attorney for Plaintiffs